Walter Freeman v. Commissioner. Walter Freeman and Shirley Freeman v. Commissioner.
Freeman v. Commissioner
Docket Nos. 54900, 54901.
United States Tax Court
T.C. Memo 1957-14; 1957 Tax Ct. Memo LEXIS 235; 16 T.C.M. (CCH) 71; T.C.M. (RIA) 57014; January 28, 1957
*235 Leonard J. Schwartz, Esq., Bankers Securities Building, Philadelphia, Pa., and J. Victor O'Brien, Esq., for the petitioners. Lyman G. Friedman, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined the following deficiencies in income tax: Year
Deficiency
Docket No. 54901
1948
$ 22,776.74
1949
100,057.08
1950
53,302.16
1951
40,071.92
Docket No. 54900
1952
54,761.87
The issues are: 1. Were the withdrawals made by petitioner Walter Freeman from four corporations dividends and distributions of capital, or loans? 2. Are the petitioners entitled to deductions for interest of $1,826.40 and $2,182.12 in the taxable years 1950 and 1951, respectively? The petitioners concede that the respondent did not err in disallowing certain deductions claimed for travel and entertainment expenses in each of the taxable years. Findings of Fact A portion of the facts have been stipulated; they are incorporated herein by reference as part of these findings. Petitioners, husband and wife, are residents of New York City. During the taxable years they were interested in certain corporations each *236 of which had only one class of authorized capital stock. Philip Freeman, father of Walter Freeman, was the president and treasurer, and Walter Freeman the vice-president and secretary of each corporation. The stockholders and directors of these corporations during the taxable years were as follows: Percentage
Stockholders
Holding
Directors
Philip Freeman Co., Inc.
Philip Freeman
50%
Philip Freeman
Walter Freeman
50%
Walter Freeman
Sylvia Miller
Freebro Realty Corp.
Philip Freeman
25%
Philip Freeman
Walter Freeman
25%
Walter Freeman
Shirley Freeman
25%
Elsie Freeman
Elsie Freeman
25%
Saki Realty Corp.
Philip Freeman
25%
Philip Freeman
Walter Freeman
25%
Walter Freeman
Shirley Freeman
25%
Elsie Freeman
Elsie Freeman
25%
Philwal Realty Corp.
Philip Freeman
25%
Philip Freeman
Walter Freeman
25%
Walter Freeman
Shirley Freeman
25%
Elsie Freeman
Elsie Freeman
25% Sylvia Miller was the sister of Walter Freeman, and Elsie Freeman was his stepmother. Walter Freeman will hereinafter be referred to as the petitioner. The cost of petitioner's stock in Philip Freeman Co., Inc. was $105,000, and the cost of his stock in each *237 of the other three corporations was $125. Philip Freeman Co., Inc. was during the years in question an active business corporation engaged in the business of buying, selling and dealing in electrical lighting fixtures and metal parts on a wholesale basis. The Freebro Realty Corp., Saki Realty Corp. and Philwal Realty Corp. were corporatios with real estate holdings only. Petitioner entered the employ of Philip Freeman Co., Inc. in 1921, at which time he was 17 years of age. His father, Philip Freeman, was in active control and supervised the business at that time and remained in active control and supervision until 1947, at which time his health began to fail. Beginning with the year 1948, Philip Freeman ceased his active supervision of the business of the corporation. During the year 1948, and a part of 1949, Philip Freeman attended to business sporadically, and following a heart attack in 1949, never came to the business offices of the company. Beginning in 1948, petitioner was in active control of the company's business. Petitioner and his father were the dominant officers of the three realty companies, and as his father's health failed, petitioner assumed control of these *238 corporations. In 1948 and continuing through 1952, the petitioner gambled on a large scale. At the beginning of the year 1948, the petitioner was comfortably fixed personally, owning certain securities and some cash in addition to his stock in the four corporations. All of petitioner's personal estate, other than his stock, was disposed of by petitioner during 1948 in order to pay his gambling losses. Petitioner's gambling activities consisted of playing craps and betting on baseball, basketball and football games with professional gamblers. Beginning in the latter part of 1948, and continuing through 1952, petitioner was charged in the accounts of the four corporations involved with substantial withdrawals from the companies and credited with substantial repayments and credits against the withdrawals. Total withdrawals, total repayments and credits, and resulting net withdrawals from each of the four corporations during the years in question were as follows: Total
Total
Repayments
Net With-
Withdrawals
and Credits
drawals
Philip Freeman Co., Inc.
1948
$ 63,975.80
$ 45,434.42
$ 18,541.38
1949
802,873.60
575,500.68
227,372.92
1950
318,442.45
205,365.91
113,076.54
1951
248,447.52
107,857.30
140,590.22
1952
1,008,884.32
896,586.44
112,297.88
$2,442,623.69
$1,830,744.75
$611,878.94
Freebro Realty Corp.
1948
$ 24,568.00
$ 12,200.00
$ 12,368.00
1949
66,744.28
43,893.09
22,851.19
1950
2,927.26
1,500.00
1,427.26
1951
6.50
(6.50)
1952
$ 94,239.54
$ 57,599.59
$ 36,639.95
Saki Realty Corp.
1948
$ 29,875.00
$ 25,250.00
$ 4,625.00
1949
176,525.79
119,299.71
57,226.08
1950
3,500.00
9,452.75
(5,952.75)
1951
1952
$ 209,900.79
$ 154,002.46
$ 55,898.33
Philwal Realty Corp.
1948
$ 35,390.00
$ 19,800.00
$ 15,590.00
1949
52,706.02
40,143.62
12,562.40
1950
7,605.28
835.00
6,770.28
1951
2,132.44
2,132.44
1952
$ 97,833.74
$ 60,778.62
$ 37,055.12
*239 The petitioner's withdrawals and credits in the Philip Freeman Co., Inc. account arose in large part as follows: When the petitioner, for example, lost $900 in gambling, he had no personal funds to meet the gamblingloss and Philip Freeman Co., Inc.'s bank balance was inadequate to take care of the loss. The petitioner thereupon borrowed $1,000 on a corporation note payable at 6 per cent but the lender would deliver to the petitioner only $900. The $100 deducted was taken by the lender as a discount charge and the petitioner would deposit the $900 in the corporation bank account and issue the corporation's check in the amount of $900 to pay the gambling loss. On the books of the corporation, the $900 deposited by the petitioner was credited to him and a corporation check issued to pay the gambling debt of the petitioner was charged as a withdrawal. The corporation note issued to thelender in the amount of $1,000, however, did not appear on the books and records of the company until a later date when the note became due. At that time, the petitioner would borrow on a corporation note from another lender or perhaps the same lender $1,200 payable with interest at 6 per cent. The *240 lender would immediately deduct the "discount" charge of $120. The balance of $1,080 would be deposited in the corporation bank account against which would be issued a corporation check to pay the first loan of $1,000 with interest at 6 per cent. The deposit was treated as a credit to the petitioner on the books of the company and the check drawn to pay the note was charged to the petitioner as a loan. The note, however, in the amount of $1,200 payable with interest at 6 per cent was nowhere reflected on the books and records of the company, nor did anyone except the petitioner know about the existence of the note liability. Credits consisted not only of borrowings deposited in the bank account as above described but also of petitioner's salary, $15,000 a year, and some gambling winnings which the petitioner deposited in the company's bank account. The charges and credits as above described during the years 1948 to 1952, inclusive, were in various amounts and involved a great many transactions occurring 3 or 4 times a week and as many as 4 and 5 times a day. In the case of the three real estate corporations, the petitioner sold company assets and withdrew the proceeds of such *241 sales and the withdrawals were charged on the company's books to the petitioner's account. The credits to petitioner's account consisted of salaries, gambling winnings and borrowings of the petitioner deposited in the three real estate companies' bank accounts. Petitioner did not want his father to know about the withdrawals he was making from these corporations, and toward the end of each month he made deposits to reduce the amount of the debit balances in his accounts. Petitioner regarded his withdrawals from the four corporations as loans, and was always hopeful of winning a large amount so that he would be able to repay the loans. A certified public accountant, employed by Philip Freeman Co., Inc. to audit its books and prepare its returns, became concerned about the withdrawals and their effect upon the financial condition of the company. He discussed them with petitioner practically every month when he made the audit, and petitioner told him that he was "pulling himself out", that it would take a little while longer, and that gradually he would repay the amounts withdrawn. The cash assets as they appear on the corporate income tax returns filed for Philip Freeman Co., Inc. *242 and the three real estate corporations for the years 1948 to 1952, inclusive, are as follows: Cash
Beginning of
Cash End of
Taxable Year
Taxable Year
Philip Freeman Co., Inc.
1948
$26,542.16
$25,487.12
1949
25,487.12
(6,365.54)
1950
(6,365.54)
1,593.69
1951
1,593.69
(12,376.99)
1952
(12,376.99)
(64,658.76)
Philwal Realty Corp.
1948
$ 3,071.46
$ 1,119.13
1949
1,119.13
44.00
1950
44.00
91.59
1951
91.59
323.50
1952
323.50
183.17
Freebro Realty Corp.
1948
$ 1,123.07
$ 665.90
1949
665.90
41.24
1950
41.24
72.81
1951
72.81
185.72
1952
185.72
(13.55)
Saki Realty Corp.
1948
$ 1,042.34
$ 3,555.39
1949
3,555.39
(8,025.71)
1950
(8,025.71)
54.85
1951
54.85
26.58
The amounts allocable to capital and surplus appear on the balance sheets of the corporations for the years 1948 to 1952, inclusive, as follows: Capital and
Capital
Surplus Begin-
and Surplus
ning of Year
End of Year
Philip Freeman Co., Inc.
1948
$309,198.29
$315,926.82
1949
315,926.82
202,831.74
1950
202,831.74
309,654.50
1951
309,654.50
326,313.56
1952
326,313.56
372,408.50
Philwal Realty Corp.
1948
$ 15,798.40
$ 23,240.33
1949
23,240.33
28,568.61
1950
28,568.61
39,161.33
1951
39,161.33
42,045.64
1952
42,045.64
44,005.43
Freebro Realty Corp.
1948
$ 24,688.26
$ 29,293.20
1949
29,293.20
38,880.20
1950
38,880.20
42,787.94
1951
42,787.94
45,294.36
1952
45,294.36
48,726.34
Saki Realty Corp.
1948
$ 24,544.03
$ 53,823.58
1949
53,823.58
70,154.46
1950
70,154.46
67,397.92
1951
67,397.92
64,651.22
*243 The net withdrawals made by the petitioner from the corporations were reported as accounts receivable on their Federal income tax returns filed for the taxable years. Despite petitioner's efforts to keep knowledge of his withdrawals and gambling activities from his father, the latter found out about them in the latter part of December 1949, and terminated petitioner's power to sign corporate checks. In January 1950 Philip Freeman instituted a law suit on behalf of Philip Freeman Co., Inc., against petitioner and various bookmakers and gamblers to recover the funds withdrawn by petitioner. This suit was settled as to all defendants with the exception of petitioner against whom it is still pending. Petitioner was deprived of the power to sign corporate checks for three or four months in the early part of 1950. At the end of this period he told his father that he could not operate the business without the power to sign checks, and this power was restored to him at that time when he promised his father that "everything would run correctly". Petitioner did not keep his promise and during the remainder of 1950, and during 1951, he made withdrawals for gambling purposes without the *244 knowledge or consent of his father. In the early part of 1952, petitioner found it necessary, because of an urgent need for funds, to disclose to his father that he had been making these withdrawals and his father's reaction was that he "wasn't going to believe anything further" that petitioner said and that he wanted to dissolve the business. As a compromise, petitioner agreed to buy the stock of Philip Freeman Co., Inc., owned by his father for a price of $350,000, payable over a period of ten years. The stock was held by the company's attorney in escrow and petitioner never made any payment on account of the purchase price. His father died on July 25, 1952, leaving an insolvent estate. Philip Freeman Co., Inc. operated under Chapter 11 of the Bankruptcy Act beginning May 11, 1953, and in February, 1954, was adjudicated a bankrupt. The three real estate corporations each have as their sole asset the net withdrawals of the petitioner carried on the books of the corporations as accounts receivable. Otherwise the corporations have no assets or operations. Petitioner never gave to any of the corporations from which he was withdrawing funds during the years 1948 through 1952 a note *245 nor did he agree to repay at any specific time or to pay any interest. During the years 1948 through 1952 none of the corporations from which the petitioner withdrew funds declared a dividend by action of their board of directors. In determining the deficiencies, the respondent determined that the net withdrawals made by petitioner during the taxable years from each of the four corporations were dividends to the extent that they did not exceed the current or accumulated earnings and profits of each corporation for the year in which the withdrawals were made, and that to the extent they exceeded current or accumulated earnings and profits they constituted distributions of capital. If the net withdrawals were not loans, the current income of Philip Freeman Co., Inc. for the years 1948, 1950 and 1951 was sufficient to cover the withdrawals for such years to the extent they were treated as dividends by respondent, and its accumulated earnings and profits were sufficient to cover the withdrawals for the year 1949 to the extent treated as a dividend by respondent. If the net withdrawals made by petitioner each year from Saki Realty Corporation, Freebro Realty Corporation, and Philwal *246 Realty Corporation were not loans, the amounts available for distribution as dividends by these corporations each year were as follows: Taxable
Saki
Freebro
Philwal
Year
Realty Corp.
Realty Corp.
Realty Corp.
1948
$53,349.57
$28,793.20
$22,740.23
1949
61,428.79
26,012.20
11,478.61
1950
9,651.51
10,592.72
1951
2,925.35
The withdrawals made by petitioner from the four corporations in each of the years 1948 to 1952 inclusive were loans and not taxable distributions. In their returns for the years 1950 and 1951, the petitioners claimed deductions for interest in the amounts of $1,826.40 and $2,182.12, respectively. These deductions were disallowed by the respondent. Opinion RAUM, Judge: The respondent contends that the withdrawals made by petitioner from the four corporations were dividends to the extent of available earnings and profits, and that the excess over earnings and profits were capital distributions to the extent that they did not exceed the cost of the stock of the corporations owned by petitioner. The petitioner contends that the withdrawals were loans or embezzled funds, and that, in either event, they did not constitute *247 taxable income. The question raised by the parties is one of fact, and we have made a finding that petitioner's withdrawals were loans. The evidence discloses a bizarre state of affairs. Petitioner became inextricably entangled in gambling transactions of great magnitude. He was hopeful, although not with justification, that his luck would change and that he would be able to restore all the unauthorized withdrawals to the corporations. In fact, he did have substantial winnings, which, together with his salary, he deposited in the corporate bank accounts as partial repayment, but his winnings were never of sufficient magnitude to offset the withdrawals completely. After considering all the evidence we have concluded that the withdrawals were intended as loans and therefore did not represent distributions of dividends or capital. Cf. Carl L. White, 17 T.C. 1562; Victor Shaken, 21 T.C. 785. The remaining issue involves deductions of $1,826.40 and $2,182.12 claimed in petitioner's returns for 1950 and 1951 for interest. While petitioner testified that he was required to pay interest on his gambling debts, there is no evidence showing the amount of interest *248 paid or to whom and when it was paid. Moreover, the evidence indicates that the petitioner's borrowings were on the corporations' credit and notes and that any interest thereon would have been the corporations' obligation and deduction. The respondent did not err in disallowing the claimed deductions. Decisions will be entered under Rule 50.