**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Lyndon A. DURANT, Defendant-Appellant.**

**No. 14005.**

United States Court of Appeals Seventh Circuit.

Nov. 6, 1963.

Rehearing Denied Dec. 30, 1963.

[redacted]

[redacted]

[redacted]

George D. Crowley, Chicago, Ill., Gerald, C. Risner, Chicago, Ill., Crowley, Barnett, & Goschi, Chicago, Ill., of counsel, for appellant.

James P. O'Brien, U. S. Atty., John Powers Crowley, Asst. U. S. Atty., Chicago, Ill., Louis F. Oberdorfer, Asst. Atty. Gen., Joseph M. Howard, John P. Burke, Attorneys, Department of Justice, Washington, D. C., John Peter Lulinski, Asst. U. S. Atty., for appellee.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and CASTLE, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Lyndon A. Durant, defendant, having been indicted under 26 U.S.C.A. § 7201 and charged in three counts with willfully attempting to defeat and evade a part of income tax due and owing by him and his wife to the United States of America, for the calendar years 1954, 1955, 1956, the deficiency totaling $142,-714.40, pleaded not guilty and was tried by the court without a jury.

The court having denied defendant's motions for judgment of acquittal at the close of the government's case and at the close of all the evidence, defendant was found guilty on each count and judgment was entered accordingly. Defendant was sentenced to the custody of the attorney general for a period of 60 days on each count, the sentences to run concurrently, and fined $15,000 and costs. From said judgment defendant appealed to this court.

According to the stipulated proof, unreported income totaling $212,328.97 up-

on which the tax deficiency for the three years is computed, was derived from corporate expenditures of United Manufacturing Company, an Illinois corporation, Chicago, Illinois, made for the personal benefit of taxpayer. The immediate beneficiaries of these expenditures, other than defendant personally, are identified in the stipulations. These expenditures numbered 2572 and involved the issuance of 686 corporate checks. They were charged chiefly to corporate expense accounts for travel, automobile, entertainment and selling, and also to freight, office expense, engineering, contributions, professional services, factory expense, office equipment, dues and subscriptions, rent and advertising.

Government exhibits 4, 5, 6 set forth separately each of said expenditures for the years 1954, 1955 and 1956 respectively. Abbreviations used in these exhibits are explained as follows:

RT—Round Trip
OW—One Way
CHGS—Charges
AC—Account
PR—Pair
BRA—Brassiere
CTN—Carton
W-W—Wall to Wall
BEV—Beverages
HH—Household
PYMT—Payment

The government contends that this $212,328.97 was, and that defendant knew it to be, income, and the district court so found.

None of these items was charged to the personal account of taxpayer, which was carried on the corporate books under the title "L. A. Durant". It appears that this account had been maintained since the incorporation of United and even prior thereto during the period 1943 to 1946, when the business was operated as a sole proprietorship. During the entire prosecution period 1954–1956, this account was charged only three times for a total of $2,700.26 with purchases from the vendors who supplied the 2572 stipulated items involving the amount of the income not reported by defendant upon which this case rests. The government points out that, while there is evidence that defendant from time to time had given instructions on charging items to this account, there is no evidence cited to us that he ever gave explicit instructions to any corporate employee how to charge any of the 2572 items in issue. We have found none.

■ The government's position is that defendant knew that these items would not be charged to his account in the absence of instructions from him, that he intended they should be charged to corporate expense accounts, that he knew they constituted income to him and that he willfully suppressed this additional income to him in his joint income tax returns. The trial court so found, and the government submits its findings are amply supported by the evidence.

On the other hand, defendant insists that he had assumed that all items paid by the corporation for his personal benefit were being charged to his personal account. Although he testified that he could not recall telling anyone specifically to make a charge to his personal account, he testified that, if he made any withdrawals from the corporation, it was his understanding that he would have to repay them.

H. L. Oettinger, an experienced accountant, in 1946 was hired by defendant as overseer of the office. He had the responsibility of seeing that the distribution of expenses was proper. To him defendant delegated the administrative end of the business. In July of 1951 Walter B. Taibleson, a certified public accountant, became comptroller of United. He prepared tax returns for the years 1951 through 1955.

According to Frances Croson, the accounts payable clerk, two routines were used for handling bills. Generally they were received, analyzed and classified for distribution to the proper account and paid by check on a weekly basis, with the assistance of a National Cash Register

office machine. The alternative routine was to expedite particular items on an individualized basis, in which case the checks were typed out as needed, and distributed once a month to various corporate accounts. These so-called "typed checks" had a detachable bottom portion for purposes of recording the expenditure as to payee, nature of purchase, classification, etc. Carl Olson, purchashing agent, received the bulk of the purchase bills for purpose of noting the proper account distribution. Other bills went to the specific persons to whom addressed or who were responsible for a particular account.

On classification questions, according to Miss Croson, in 1950 more bills without any indication as to distribution began coming through to her; that, prior to that, the number of bills without any indication as to distribution was negligible; that some of the bills came to her and some to Oettinger, who would hand them to her; that, in the beginning, she would ask Oettinger how such bills would be distributed, and he invariably replied, "Use your best judgment"; that she never discussed procedures with defendant. During 1948, the bills generally came to her already bearing a notation of the proper account distribution. When items such as Marshall Field, Saks Fifth Avenue and Bonwit Teller, became larger and more numerous, she asked Oettinger, who told her to "handle them as best you can" and she distributed them as similar items had been handled before. Defendant, and Oettinger also, would ask her to make out "typed checks" to various persons, but neither ever told her how to charge them.

Occasionally it was defendant's practice to give bills to Taibleson or to Oettinger for payment, but not to indicate how such bills should be charged. However, defendant did at times give instructions to charge himself personally or to a corporate project called "Caravan", based at Denver, which was engaged in development of electronic devices in connection with drilling of wells. In the absence of any such indication, the practice was to charge an expenditure to a corporate expense account.

As to many of the indictment items, defendant instructed his employees personally either to issue a check and return it to him; to issue a check in payment of a bill, where the only documentation of such bill was defendant's oral direction; to draw petty cash and give the funds to him; or to purchase merchandise for him to be disposed of at his personal direction or shipped where he designated. Defendant never did explain to employees that such items all of which were herein stipulated as personal, were not business expenses but were personal to him.

Defendant also took blank checks with him on trips out of the city and, according to custom, needed no one's authority to do this. On occasion, he returned the bottom half of the check to the bookkeeping department. Of those items in evidence of such a nature, in only two instances did he indicate the purpose on the voucher portion as shown in the following two paragraphs. In all other instances he made no indication of the purpose for which the check was written. If Durant did not furnish this bottom half, or voucher portion, not only was there no way of knowing the purpose for which it was drawn, but the company was unaware it was issued until it cleared the bank.

Government exhibit 713 is a corporate check dated May 19, 1956, written by defendant in the amount of $576 to the order of John Engstead. The bill was incurred by Cynthia Brooks for photographs. Defendant entered the notation "Comm. Photo" on the voucher attached to the bottom of the check form and the item thereafter was entered to "office expense". Defendant on cross-examination said "Commercial Photo" may have been the name of the company and that he did not remember why he put on this notation.

Exhibit 357 is a corporate check written to cash by defendant on June 18, 1954, in the amount of $2,000 and given

to Dorothy Raynor. Defendant admittedly made the notation "Spfld Ill—Eagle River Trip" on the voucher portion of the check and the item was thereafter charged to "travel expense". Defendant acknowledged the endorsement on this check was by Dorothy Raynor and that he "must have" given it to her. Although the item was stipulated as personal, defendant said this thought had not occurred to him.

Reports of business conditions were prepared daily and weekly and were submitted to defendant in that order. Defendant admittedly received them daily when in Chicago and by mail when absent.

Government exhibit 1086 shows that check disbursements for defendant's personal benefit and so charged to his L. A. Durant account, were substantially all reflected on the daily reports with the designation "L. A. D." in the portion entitled "Disbursement Summary". Defendant testified this notation "L. A. D." on daily report items meant that they were being charged to his personal account.

Exhibit 1087 is a sample daily report for July 26, 1956, which, in the summary of disbursements portion, contains the following entry "L. A. D. CKS. of 6–27 * * * Travel Exp. 9,500.00". This $9,500 is the sum of exhibits 141 and 143. Exhibit 141 is a $3,000 check to cash dated June 27, 1956. Exhibit 143 is a $6,500 check issued by defendant to a Honolulu jewelry firm on June 27, 1956, in payment for pearl jewelry purchased by defendant as gifts for friends. The $9,500 was charged to corporation "travel expense".

As the government points out, of a total of $56,304.95 in check disbursements charged to the L. A. Durant account in 1956, the daily reports reflect $55,124.63. This $56,304.95 was effected by the issuance of 25 checks, whereas 319 checks were issued to effect the personal disbursements stipulated in government exhibit 6 during 1956, none of which appeared in the daily reports as "L. A. D."

account charges. These figures have not been questioned by defendant.

In 1951, agent Zivin examined United's and defendant's returns for 1949 and 1950. He made no third-party investigation of certain unsubstantiated expenses disallowed to the corporation, and also could not readily determine from the corporate books which were items of expenditure made for the benefit of defendant. He reviewed these items several times with Oettinger and Durant to determine their true nature. In December 1951, in a final conference Zivin so stated to Oettinger and defendant, with a warning that this practice had to be stopped, to which defendant replied, that if it had been done it was a mistake and that the items should have been charged to his personal account.

Zivin's itemized report of the corporation's personal and unsubstantiated expenses which he charged to defendant showed the following totals:

### L. A. Durant

| | Personal | No Substantiation |
|---|---|---|
| 1949 | $ 3,055.50 | $47,400.00 |
| 1950 | 39,534.71 | 74,342.86 |

Zivin charged both categories to defendant as dividends. Sworn protests were filed in which defendant alleged that, with the exception of nine items, all disallowed expenses were exclusively devoted to official corporate expense by defendant.

The case was reassigned to revenue agent Wagar, who consulted Zivin's reports and examined the years 1951, 1952 and 1953. Without any third-party investigation, Wagar prepared reports dated April 26, 1954, proposing certain adjustments covering the years 1949 through 1953, and disallowing to the corporation certain of the expenses claimed and charging to defendant as dividends certain amounts for each year. Before submitting his report, Wagar discussed with defendant the practice of taking

corporate tax deductions for personal expenditures and said this practice was improper. Defendant did not explain how they came to be charged to corporate expense accounts. Wagar's report contained an itemized listing of corporate expense items determined to be personal in nature. Defendant discussed with the comptroller, Taibleson, the selling and travel expenses disallowed by Wagar.

The proposed assessments were settled by agreements for payments of additional corporate and personal taxes, totaling about $600,000.

Thereafter, defendant's personal expenditures continued to be paid by and charged to the corporation. During 1954, 1955 and 1956, $79,104.95 in personal items was actually disbursed to vendors who had been identified with dividend items charged to defendant in the prior audits. Defendant admitted that he made no changes in the accounts payable routine.

Defendant himself testified that in 1951 or 1952 he met with Agent Zivin and that, on some unfixed date in 1954, he had a conversation with Agent Wagar. He admitted that there was a discussion with Zivin about personal items that the corporation had paid for. He "assumed" that he knew what the discussion with Zivin "was all about."

He testified that he read and signed a protest against Zivin's ruling, prepared by his lawyers.

1. We first dispose of the contention of defendant that, if he had an intent to repay United Manufacturing Company for personal expenses paid by it on his behalf, the fact that they were not charged to his personal account has no effect, but they are loans. He cites Estate of Helene Simmons, 26 T.C. 409 (1956), Carl L. White, 17 T.C. 1562 (1952), and Walter Freeman, 16 T.C.M. 71 (1957).

In the case at bar, the district court found that the record is clear that at no time were the payments in question ever considered as loans by the parties. The corporation did not carry them on its books as notes or accounts receivable; no notes or other evidence of loans were ever executed by the defendant; no interest was ever paid to the corporation by the defendant; no maturity or repayment date was set; no repayment was made; defendant never advised any of the responsible subordinates that the payments were to be treated as loans and charged to his personal account; in fact, no action was taken by either the defendant or the corporation which would indicate that the payments were loans.

The district court found that the payments made by the corporation in the taxable years for defendant's benefit were income to defendant, which was known to defendant. This finding is supported by the uncontradicted evidence in the record, most of it stipulated.

Accordingly we hold that the payments by the corporation for the benefit of defendant were not loans by it to defendant, but were income.

2. Defendant insists that the statute here involved, 26 U.S.C.A. § 7201, requires proof of willfulness by the defendant.

That section reads:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony * *."

Defendant submits that the most that can be inferred from the evidence in this case is a certain amount of laxity, but his counsel urges that any amount of laxity does not constitute the requisite willfulness.

As an abstract proposition, we would agree that no amount of laxity in and of itself constitutes willfulness. However, in the case at bar, we believe that the district court properly recognized the additional factors revealed by the records, tending to prove a willful intent: (a) defendant knew the corporation was paying his expenses, (b) the payments were not considered loans by the parties,

(c) defendant knew the corporate payments were income to him; and therefore properly found that defendant willfully failed to include them in his returns.

As we have indicated, the events following the prior audits for 1949–1953 served to clearly warn defendant of his duty to report as his personal income the charges of indebtedness incurred by him and paid by the corporation. Moreover, his failure to indicate on many of the expenditure vouchers any notation indicating appropriate classifications leading to a proper charge to him personally, also tends to support the finding of willfulness.

His continuous failure to see that the warnings of Zivin and Wagar were heeded might reasonably be expected to result in a continuation of the practice of charging his personal obligations to the corporation.

We are not concerned here with any ethical question as to the propriety of defendant's benefactions to various ladies. No requirement of federal tax laws bars such nurture of cordial relations with them. Yet the court, as the trier of the facts, had a right to consider the repeated charges to the corporation for gifts by defendant to feminine acquaintances despite the previous warnings, and to find that he had deliberately and willfully continued to permit the making of such improper charges. By the sequence of events, the continuation of that practice, which in prior years may have resulted from defendant's negligence, in the years 1954, 1955 and 1956 became deliberate and willful.

Whether defendant willfully attempted to defeat and evade taxes in this case presented a question for the trier of the facts. There was substantial evidence before the court to support the result which it reached. The credibility of defendant as a witness and the weight to be given to his testimony were peculiarly within the knowledge of the court, which had an opportunity to observe his demeanor while testifying. On appeal, we are forced to hold, as we do, that there was sufficient evidence viewed in the light most favorable to sustain the court's finding, to prove the charge upon which defendant was tried. Blauner v. United States, 8 Cir., 293 F.2d 723, 725 (1961); United States v. Dudley, 2 Cir., 260 F.2d 439, 440 (1958); United States v. Tutino, 2 Cir., 269 F.2d 488, 490 (1959). Cf. Wolfe v. United States, 6 Cir., 261 F.2d 158, 160 (1958).

For these reasons, the judgment from which defendant has appealed is affirmed.

Judgment affirmed.