ESTATE OF ERNEST CLARKE, DECEASED, HILDA CLARKE, ADMINISTRATRIX, AND HILDA CLARKE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4888–66.   Filed May 27, 1970.

*Frederick Wm. Heath, Dale C. Campbell,* and *Edwin G. O'Brien,* for the petitioners.

*John H. Menzel* and *Patrick R. McKenzie,* for the respondent.

# 1158

OPINION

The first four issues presented for decision—whether the Clarkes received taxable income (1) from the diversion of corporate receipts, (2) from the payment by Gypsum of the cost of construction of and improvements to houses owned or sold by them, (3) from an increase in their income from a partnership, and (4) from the sale of certain real estate in 1955 [3]—are purely factual. In our Findings we have set forth the facts on these issues in detail, having painstakingly culled them from a voluminous record consisting of over 1,500 pages of testimony and hundreds of exhibits. Most of the findings require no explanation; we shall discuss only the most salient of the facts as they bear upon the issues to be decided.

## Issue 1. Diversion of Omitted Corporate Receipts

The Clarkes owned 50 percent of the stock of Gypsum, a construction company specializing in the installation of gypsum roof decks; the remaining Gypsum stock was owned by Ellerhorst and his wife. Throughout all of the years in issue substantial amounts of corporate receipts were diverted from Gypsum. The record paints a picture of diversion of the receipts from hundreds of separate individual items, some large and some small, falling into one of the following four categories: (1) Receipts from "unnumbered" general construction and roof deck jobs, (2) refunds of insurance premiums, water permit fees, and certain other corporate payments, (3) sales of scrap metal to one customer, and (4) sales of miscellaneous supplies to various corporate employees. These receipts were neither recorded on Gypsum's books and records nor reported on its income tax returns, although the re-

---

[3] The amounts of personal expenses for telephone, groceries, gas, dues, etc., paid by Gypsum on the Clarkes' behalf have been stipulated. These amounts represent taxable income to the Clarkes. See *United States* v. *Durant,* 324 F.2d 859, 863 (C.A. 7, 1963), certiorari denied 377 U.S. 906 (1964).

lated costs were entered on the corporate books and deductions therefor were claimed on the returns. In order to keep track of the amounts due and amounts paid on the unnumbered jobs, a separate accounts receivable list—wholly distinct from the corporate books—was maintained by one of the secretaries in Gypsum's office. Respondent attributed one-half of the total amount of omitted receipts to the Clarkes.

At the trial petitioners did not seriously contest the fact that substantial amounts of corporate receipts had been omitted from Gypsum's books, and on brief they admitted that "The corporate income was understated due to devious methods." Rather, petitioners' attack is directed against respondent's determination that one-half of these receipts are traceable to the Clarkes. Petitioners contend that the existence of many errors in the revenue agent's report upon which the deficiencies are based relieves them of the burden of disproving the deficiencies and shifts the burden of proof to respondent. Asserting that Clarke, with his limited education, did not understand the bookkeeping entries by which the omissions were concealed on the corporate books, and that the omitted receipts were diverted to others—mainly Ellerhorst—they maintain that respondent failed to satisfy his burden of proof. We disagree.

Petitioners' argument founders on the incorrectness of their major premise. Subject to certain exceptions not present here, see, e.g., Rule 32, Tax Court Rules of Practice (new matter pleaded in the answer), and secs. 6902(a) (transferee liability) and 7454 (fraud), the burden of proof is upon a petitioner. And petitioners have failed to show that they should be relieved of this burden. The errors in the revenue agent's report concerned only a few out of a total of more than 950 items, and many of these were due to inclusion of an item in the wrong year or to inaccuracies in transcribing figures, rather than to errors in identifying omissions from Gypsum's income. But even so, it is well settled that where, as here, the deficiencies are keyed to specific items—as distinguished from a determination based upon use of circumstantial evidence, as in the "net worth" or "bank deposits" methods—a petitioner's burden of proof must be satisfied as to each item before the burden of proof on that and related items is shifted to respondent. *Foster* v. *Commissioner*, 391 F. 2d 727, 735 (C.A. 4, 1968), remanding on another issue a Memorandum Opinion of this Court. We have taken account of the errors made by the revenue agent in making our findings; but we cannot say that the burden of proof has shifted to respondent. Cf. *Helvering* v. *Taylor*, 293 U.S. 507, 514–515 (1935).

Not only is petitioners' major premise faulty, but their minor premise—that Clarke did not understand bookkeeping and that the omitted

receipts were diverted to persons other than Clarke [4]—is equally with-out support. Our findings fully describe the methods by which the proceeds from the omitted receipts were siphoned from Gypsum. Despite the facts that Clarke had a limited education and may not have understood the intricacies of accounting by which his wrongdoing was concealed, we are not convinced that he was unaware of, or that he did not encourage and benefit from, the omissions. Indeed, though instructions not to assign numbers to jobs were usually given by Clarke's associate, Ellerhorst, it is clear that such instructions were also given by Clarke from time to time. The testimony of employees of Gypsum, as well as notations on receipts that the proceeds were given to Clarke and Ellerhorst (noting, in some instances, that cash was paid from one to the other to effectuate an equal split of their diversions), clearly establish that Clarke knowingly received some of the diverted funds.

Although the record leaves some doubt as to the exact percentage or portion of these funds actually received by Clarke, petitioners have failed to prove that that portion was different from the one-half determined by respondent. While it can be argued that Ellerhorst—a domineering, aggressive individual, who at the time of trial was in prison for attempted murder—did not divide the moneys equally with Clarke or that Sundberg—a key figure in the fraudulent scheme, who at the time of trial was serving a prison sentence for armed robbery—shared to some extent in them, petitioners have not shown that this was the case. We hold that one-half of the receipts were diverted to Clarke and are taxable income to him. See *Jack M. Chesbro*, 21 T.C. 123, 129 (1953), affirmed per curiam 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956).

### *Issue 2. Payment by Gypsum of Cost of Construction and Improvements*

Again, this issue is purely factual. The job folders for the two houses constructed for the Clarkes by Gypsum on Hennepin Avenue—job Nos. 1350 and 1835—were admitted into evidence. The payroll records and invoices contained therein show a practice of charging to other jobs a sizable portion, usually one-half, of the expenses incurred on these two jobs.[5] In some instances the instructions to make such charges were given by Clarke. But regardless of who gave the instruc-

---

[4] Petitioners' argument that Clarke received none of the diverted funds is undercut somewhat by their assertion that, during the years in issue, Clarke was continually paying back large sums of money to Gypsum, an argument that implies that he did receive some of the unreported funds.

[5] In making our findings as to the amounts of expenses of job No. 1350 charged to other jobs, we have excluded two items—$1,400 for work performed by Priest Plumbing and $266 for material supplied by Stamats Bros.—which respondent included in his determination, because there is no evidence that these items were indeed charged to other jobs.

tions, the beneficiaries thereof were the Clarkes, whose expenses for these two houses were, in effect, paid by Gypsum to the extent they were charged to other jobs. And it is well settled that expenses incurred and paid by a corporation for construction work on property belonging to a shareholder is taxable income to the shareholder. *Elmer J. Benes*, 42 T.C. 358, 379 (1964), affd. 355 F. 2d 929 (C.A. 6, 1966), certiorari denied 384 U.S. 961 (1966). We reject petitioners' argument that these chargeoffs were legitimate adjustments caused by laborers working on more than one job and material being delivered for more than one job, because the record contains absolutely no evidence that this was true as to any of the amounts we found to have been charged to other jobs.

The expenses incurred in building the house sold by Clarke to Alioto, and in making the improvements to the Clarkes' residence on Stansbury and to the house sold to Felts, were likewise charged on Gypsum's books to other jobs. All of these expenses were properly chargeable to Clarke. They were not so charged and hence represent taxable income. *Id.* at 380.

### *Issues 3 and 4. Income From Partnership and Gain From Sale of Real Estate*

Implicit in respondent's determination that the gain from the sale of the lot is taxable as ordinary income is a subsidiary determination that the lot was primarily held for sale to customers in the ordinary course of business. Sec. 1221(1). Petitioners have not shown that this subsidiary determination is incorrect. In fact, petitioners presented no evidence on this issue, or on the partnership issue. Therefore, since they had the burden of proof, we sustain respondent on both of these issues.

### *Issues 5 and 6. Fraud*

Since the years in issue ended more than 3 years prior to the date of mailing the notice of deficiency, sections 275(a), I.R.C. 1939, and 6501 (a)[6] bar the deficiencies unless respondent can show that each of the Clarkes' returns was a "false or fraudulent return with the intent to evade tax" within the meaning of sections 276(a), I.R.C. 1939, and 6501(c)(1).[7] And, of course, in order to sustain the additions to the

---

[6] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * *

[7] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(c) EXCEPTIONS.—

(1) FALSE RETURN.—In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

tax under sections 293(b), I.R.C. 1939, and 6653(b),[8] respondent must establish fraud.

The burden of proving fraud is placed upon respondent by statute. Sec. 1112, I.R.C. 1939; sec. 7454(a).[9] To satisfy this burden, respondent must establish fraud by clear and convincing evidence. *Drieborg* v. *Commissioner*, 225 F. 2d 216, 218 (C.A. 6, 1955), reversing on another issue a Memorandum Opinion of this Court. In addition, fraud must be proven for each year for which respondent seeks to avoid the statute of limitations and sustain an addition to the tax for fraud. *W. A. Shaw*, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958).

As reflected in our Findings, the Clarkes failed to report substantial amounts of taxable income for each of the years in issue. Although substantial understatement of income is some evidence of fraud, *Schwarzkopf* v. *Commissioner*, 246 F. 2d 731, 734 (C.A. 3, 1957) (effective evidence), and *Kurnick* v. *Commissioner*, 232 F. 2d 678, 681 (C.A. 6, 1956) (highly persuasive evidence), both affirming Memorandum Opinions of this Court; *Tsuneo Otsuki*, 53 T.C. 96, 107 (1969) (strong evidence), this fact alone in given situations may not be sufficient to establish fraud. *John Marinzulich*, 31 T.C. 487, 490 (1958); *Foster* v. *Commissioner*, *supra* at 733 fn. 10; *Merritt* v. *Commissioner*, 301 F. 2d 484, 487 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court. However, repeated understatements of income in successive years, coupled with other circumstances—so-called badges of fraud—showing intent to conceal or misstate taxable income, present a basis from which fraud may be inferred. *Id.; Furnish* v. *Commissioner*, 262 F. 2d 727, 728–729 (C. A. 9, 1958), remanding on another issue 29 T.C. 279 (1957); *Anderson* v. *Commissioner*, 250 F. 2d 242, 250 (C.A. 5, 1957), remanding on another issue a Memorandum Opinion of this Court, certiorari denied 356 U.S. 950 (1958); *Drieborg* v. *Commissioner*, *supra* at 219.

Petitioners' first argument is that respondent failed to satisfy his burden of proving fraud for 1950 and 1952 because the original returns filed for those years by the Clarkes were not introduced into evidence. For this reason petitioners assert that respondent is barred not only from asserting the additions to the tax for those years, but also from assessing and collecting the deficiencies for those years because of the statute of limitations.

---

[8] SEC. 6653. FAILURE TO PAY TAX.

(b) FRAUD.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).

[9] SEC. 7454. BURDEN OF PROOF IN FRAUD AND TRANSFEREE CASES.

(a) FRAUD.—In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.

It is true that where an original return for a particular year is not in evidence and there is no secondary evidence to show the contents of the return, respondent has failed to prove all of the elements of fraud, with the result that an addition to the tax for fraud for that year cannot be sustained, *Drieborg* v. *Commissioner*, *supra* at 219–220, and deficiencies barred by the statute of limitations cannot be upheld. *Alex Rubinstein*, 29 T.C. 861, 863–864 (1958), affirmed per curiam 264 F. 2d 478 (C.A. 3, 1959). However, both *Drieborg* and *Rubinstein* are distinguishable from the present controversy. In both of those cases, although respondent produced the collector's records indicating the tax paid for the years for which returns were missing, there was no evidence as to what the returns contained—i.e., the gross income reported or the credits or deductions claimed or allowed.

Here, by contrast, in addition to the Certificate of Assessments and Payments showing the amount of tax due and paid by the Clarkes, we have the penciled copies of the 1950 and 1952 returns retained by the accountant who prepared the returns. These copies show all of the income and deductions reported on the original returns. The amounts of tax shown on the retained copies and on the Certificate of Assessments and Payments correspond exactly. And we have the credible testimony of the accountant that the copies in evidence are identical to the original returns which he prepared and presented to Clarke for signature.[10] In these respects the case at bar more closely resembles *Granquist* v. *Harvey*, 258 F. 2d 599, 601 (C.A. 9, 1958), wherein the Court of Appeals stated:

the number of taxpayer's exemptions was known, the tax rate was fixed, and the tax paid was proven * * *. Also produced were his Oregon state returns for the same years * * *.

\* \* \* \* \* \* \*

It is thus apparent that there was sufficient evidence as to what the returns contained. True, it was secondary evidence, but we know of no rule excluding the use of such evidence to prove the contents of a destroyed or lost return just as in the case of any other document where the original is unavailable. * * *

See *Moore* v. *United States*, 254 F. 2d 213, 215, and fn. 3, 216 (C.A. 5, 1958), certiorari denied 357 U.S. 926 (1958) (extracts from a penciled retained copy used in preparation of a typed "dummy" copy used at the trial; as to another year, unsigned original return accepted in light of testimony by the accountant that it appeared to be the return prepared by him). We hold, therefore, that the accountant's retained

---

[10] It is well to note here that petitioners do not rely upon the principle of *Davis* v. *Commissioner*, 184 F. 2d 86, 88 (C.A. 10, 1950), remanding a Memorandum Opinion of this Court, that a taxpayer is not guilty of fraud if he has no knowledge that his return is false and he has made full disclosure to the expert preparing it. That principle would not apply here, because neither condition has been satisfied. See *Foster* v. *Commissioner*, 391 F. 2d 727, 732–733 (C.A. 4, 1968), remanding on another issue a Memorandum Opinion of this Court.

copies of the 1950 and 1952 returns are sufficient evidence of what the original returns contained.

Turning now to the substantive issue of whether respondent has satisfied his burden of proof, there are numerous "badges of fraud" present in this case. Hundreds of Gypsum's receipts were diverted from the corporation, were neither recorded on the corporate books nor reported on its income tax returns, and eventually found their way into Clarke's hands. These omissions from corporate income were so extensive that a separate accounts receivable list, not regarded as part of the corporate books, had to be maintained to keep track of them. The majority of these diverted receipts were derived from the hundreds of jobs performed by Gypsum which were not numbered in that corporation's job records, pursuant to instructions given by Clarke and Ellerhorst. False entries were deliberately made on the corporate books and records—including expense accounts of numbered jobs, petty cash and employee payroll accounts, accounts of jobs for Clarke, and accounts payable to Clarke—checks payable to Gypsum were endorsed by and cashed for Clarke, and corporate checks were issued to Clarke as "advances." The testimony and exhibits substantially confirm that although Clarke did not make the actual false entries, he participated in these devious activities and benefited therefrom. All of these activities by which substantial amounts of corporate income were consistently diverted to Clarke and Ellerhorst establish that Clarke fraudulently siphoned receipts from Gypsum and failed to report them as income on his returns for the years in issue. See *Jack M. Chesbro, supra* at 130–131.

Also, during some of the years in issue substantial amounts of expenses incurred in connection with jobs done for Clarke—construction of the houses and improvements to the properties owned by him—were charged to various other jobs being performed by Gypsum. Instructions to make such charges were sometimes given by Clarke himself. As a result of these chargeoffs Clarke paid substantially less for these jobs than they cost. It is obvious that Clarke, who had been in the construction business for many years and was in charge of Gypsum's general construction jobs, knew that he was paying less than the full cost of the work being done on the properties involved. Clarke's knowing use of Gypsum funds to pay part of the cost of constructing houses on his own property and erecting improvements for him is indicative of fraudulent intent to evade the payment of taxes. See *Elmer J. Benes, supra* at 384–385, which is indistinguishable from the present case.

This brings us to the final and most seriously contested issue—Hilda's liability for the deficiencies and additions to the tax. Sections 51(b)(1), I.R.C. 1939, and 6013(d)(3) provide that when a joint

return is filed by a husband and wife, "the liability with respect to the tax shall be joint and several." Such joint and several liability extends not only to deficiencies in tax, but also to additions to the tax for fraud, since the term "tax" includes "additions to the tax." Sec. 6659(a)(2); *Nadine I. Davenport*, 48 T.C. 921, 926 (1967), and cases cited.

Petitioners argue that Hilda is not subject to joint and several liability for any of the deficiencies or additions to the tax, because there is no evidence that she committed any fraud or had any knowledge of the source of, or the means employed in obtaining, the ill-gotten income. They assert that she had no income for the years in issue and that the reported (and unreported) income was that of her husband.

Except in limited circumstances, a spouse is liable both for deficiencies and additions to the tax for fraud attributable to unreported income and fraud of her (his) spouse, even though she (he) has no knowledge of the unreported income and is not a party to the fraud. *Horn* v. *Commissioner*, 387 F. 2d 621 (C.A. 5, 1967), affirming per curiam a Memorandum Opinion of this Court (deficiencies only; no additions determined); *Howell* v. *Commissioner*, 175 F. 2d 240, 241 (C.A. 6, 1949), affirming per curiam 10 T.C. 859 (1948); *W. L. Kann*, 18 T.C. 1032, 1044 (1952), affd. 210 F. 2d 247, 252 (C.A. 3, 1953), certiorari denied 347 U.S. 967 (1954); *Tsuneo Otsuki, supra* at 112–113; cf. *Kathleen C. Vannaman*, 54 T.C. 1011 (1970). The limited exceptions from liability involve instances in which a spouse innocent of wrongdoing did not knowingly and voluntarily execute the return. Thus, it has been held that a spouse is not liable if her (his) signature on the return is the result of duress, *Furnish* v. *Commissioner, supra* at 733–734; *Lola I. Brown*, 51 T.C. 116, 120–121 (1968); *Hazel Stanley*, 45 T.C. 555, 560–561 (1966) (dictum), or fraud, *Scudder* v. *Commissioner*, 405 F. 2d 222, 226 (C.A. 6, 1968), remanding 48 T.C. 36 (1967), rehearing denied 410 F. 2d 686 (C.A. 6, 1969), certiorari denied 396 U.S. 886 (1969), or forgery, trickery, or deliberate deception by the fraudulent spouse, *Nadine I. Davenport, supra* at 927 (dictum), or mistake, *Payne* v. *United States*, 247 F. 2d 481, 484 (C.A. 8, 1957), certiorari denied 355 U.S. 923 (1958). However, none of these exculpatory exceptions are present in this case. We conclude, therefore, that Hilda is liable for the deficiencies and additions to the tax.

Since this case is subject to appeal to the Court of Appeals for the Sixth Circuit, we have given careful consideration to a trilogy of recent cases in which that court has remanded opinions of this Court for further findings. See *Jack E. Golsen*, 54 T.C. 742 (1970) (on appeal, C.A. 10). We find nothing in the appellate court opinions in those cases to permit exoneration of Hilda.

The first, *Scudder* v. *Commissioner*, *supra*, involved a "bizarre" situation where a husband had wrongfully withdrawn funds from a partnership of which his wife was a member, and failed to report those amounts on their joint returns. The Court of Appeals held that the wife was not liable for any deficiencies or additions to the tax for fraud "which are based either directly or indirectly on [the husband's] withdrawals from the partnership," 405 F. 2d at 227, but remanded the case for further consideration of other matters not relevant here. That court reasoned that the withdrawn sums were merely unauthorized loans rather than embezzlements (and hence were not taxable even to the husband) and that the wife's execution of the joint returns was the "product of conduct equivalent in wrong to * * * fraud, trickery, and, indeed, * * * duress." *Id.* at 226. The court's supplemental opinion on rehearing made it clear, however, that its exoneration of the wife applied only to the funds taken from her partnership, as follows:

> While some of these investments undoubtedly were made with the funds taken from the partnership, the earnings on them should not be excluded solely because our ruling has already excused her from paying tax on the monies from which the investments were made.[1] * * *
>
> *          *          *          *          *          *          *
>
> * * * we do not look upon the failure of [the husband] to include earnings from his investments and properties in the joint return as "conduct equivalent in wrong to the fraud, trickery, and indeed, the duress" which has led us to hold that [the wife] is exempt from paying the tax and penalties assessed upon monies illegally withdrawn from the partnership. * * *
>
> [Footnote omitted. 410 F. 2d at 688]

The second case, *Huelsman* v. *Commissioner*, 416 F. 2d 477 (C.A. 6, 1969), remanding a Memorandum Opinion of this Court, involved deficiencies—additions to the tax for fraud were conceded by respondent—attributable to the taxpayer's husband's failure to report on their joint returns funds embezzled by him from a third party. The case was remanded for "full development" of the "evidence as to the conditions existing when these returns were signed, so crucial to the determination of liability under Section 6013(d)(3)." *Id.* at 479. The Court of Appeals was concerned about the husband's possible trickery and fraud in his relationship with his wife. It indicated that an "innocent wife" should not be "victimized by a dishonest husband" through being "fraudulently induced to sign a return which she obviously would not have signed had the embezzled money been included in it," *id.* at 480–481, and then subjected to liability for tax on money which he had embezzled.

The third case of the trilogy, *Sharwell* v. *Commissioner*, 419 F. 2d 1057 (C.A. 6, 1969), remanding in part a Memorandum Opinion of this Court, also involved deficiencies only. There the wife, a party to

what was apparently a stormy marital relationship, had kept meticulous records of her separate income which was included in the joint returns, but the source of the large amounts of omitted income determined to have been received by the husband is not at all clear. Citing *Scudder* and *Huelsman*, the Court of Appeals remanded the case for further findings to determine (1) whether the wife knew or could be charged with knowledge that her husband had received the unreported funds, (2) whether she received any benefits from such funds, and (3) the characterization for tax purposes of such funds (i.e., embezzlements, loans, or constructive dividends).

The fact pattern here is vastly different from those presented in the three cases just described. First, the moneys diverted from Gypsum and the expenses of Clarke's personal jobs charged to other jobs were not fraudulently obtained from Hilda by her husband, as was the case in *Scudder* and, apparently, in *Sharwell*.[11] Quite to the contrary, although Hilda was unaware of the detailed procedures—e.g., the unnumbered jobs, the separate accounts receivable list—by which her husband's wrongdoings were concealed, as treasurer of Gypsum she signed books of blank corporate checks. More significantly, however, she shared in the affluence resulting from such wrongdoings. As described in our Findings, a part of the diverted proceeds were used to defray the costs of building a house for her and her husband (job No. 1835) and a house given by the Clarkes to their daughter and son-in-law (job No. 2505). In addition, she received benefits from the chargeoff of a substantial part of the expenses of constructing the residence at 31327 Hennepin Avenue and the chargeoff of all of the expenses of the improvements to their residence on Stansbury. The record shows that she and her husband frequently entertained friends, Gypsum customers, and key employees at the corporation's expense. Furthermore, she testified that she knew that in addition to Clarke's salary checks, which he gave to her and she cashed, other sums from Gypsum were being deposited in their bank account.

Second, the diverted receipts omitted from Gypsum's income and the expenses of Clarke's personal jobs charged to other jobs cannot be classified as loans [12] or other nontaxable income; rather, they are con-

---

[11] Although the parties stipulated that "Ernest Clarke and Hilda Clarke, individually or jointly, owned 50 percent of the outstanding shares of Gypsum," it is clear from Hilda's testimony that her stock ownership, if any, was purely nominal.

[12] Although petitioners claim that Clarke paid large sums of money to Gypsum and his other corporations during the years in issue, thereby attempting to create the impression that he was merely borrowing whatever diverted funds he had received, they were unable to show that the payments were in any way related to funds he had "borrowed." Indeed, to the contrary, the largest of the alleged "loan repayments" (a check for $25,000, dated Dec. 22, 1955) apparently was in payment for 250 shares of Gypsum stock which the parties have stipulated were purchased on Dec. 22, 1955, for $25,000; and many, if not all, of the other checks apparently were in payment of those expenses for Clarke's personal jobs which were not charged off to other jobs.

structive dividends or "other income." See *Davis* v. *United States*, 226 F. 2d 331, 334–335 (C.A. 6, 1955), certiorari denied 350 U.S. 965 (1956) ; *Elmer J. Benes, supra* at 378–379 and cases cited.

Finally, we are convinced that Hilda's signatures on the joint returns were not the product of forgery, mistake, duress, fraud, trickery, deception, or any other type of similar conduct. Hilda testified that she did not know even the approximate amount of her husband's income and merely signed the returns—without checking the figures thereon—as they were presented to her for signature. There is thus no basis for an inference that she would not have signed the returns had they included the additional income. There is not even a hint in the record that Clarke intimidated her in any way to cause her to sign the returns, and petitioners do not contend otherwise. Indeed, except for an incident at a Christmas office party, the relationship between the Clarkes was entirely harmonious. The mere fact that Hilda signed the returns as they were presented to her does not prevent her signatures thereon from being voluntary, and certainly does not exonerate her. See, e.g., *Howell* v. *Commissioner, supra; Federbush* v. *Commissioner*, 325 F. 2d 1 (C.A. 2, 1963), affirming per curiam 34 T.C. 740, 755–758 (1960).

We hold that Hilda is jointly and severally liable with the estate, by virtue of section 6013 (d)(3), for the deficiencies and additions to the tax for fraud, to be recomputed in accordance with our findings, for each of the years in issue.

*Decision will be entered under Rule 50.*

---

During the trial respondent filed a motion to change the designation of the petitioners herein from "Ernest Clarke, Deceased, and Hilda Clarke, Surviving Spouse" to "Estate of Ernest Clarke, Deceased, Hilda Clarke, Administratrix, and Hilda Clarke." Petitioners objected on the grounds that no valid notice of deficiency had been mailed to the estate and that granting the motion would result in adding a party—the estate—which had not been previously joined herein. After careful consideration of all the relevant facts and arguments presented by both parties, we have granted the motion.

Hilda was appointed as administratrix of her husband's estate on or about February 12, 1965, primarily for the purpose of prosecuting a Federal tax refund suit, handled by counsel in the present case, on behalf of the estate. The district director of internal revenue was not informed of Hilda's fiduciary appointment. The notice of deficiency, issued May 31, 1966, was mailed to "Mr. Ernest Clarke, Deceased and Mrs. Hilda Clarke, surviving spouse."

Under section 6212(b) (1), a notice of deficiency mailed to the last known address of a deceased taxpayer is sufficient in the absence of notice to the Internal Revenue Service under section 6903 of the existence of a fiduciary relationship. *Edwin W. Eisendrath et al., Executors,* 28 B.T.A. 744 (1933). Petitioners contend that sufficient notice under section 6903(a) was made by joinder of the estate in the refund suit, and that the deficiency notice therefore was invalid. However, the U.S. Government is not a monolith, and notice to one agency of the Government—here, the Department of Justice, which has exclusive authority to defend refund suits—is not notice to another governmental agency. Cf. *Luhring* v. *Glotzbach,* 304 F. 2d 556 (C.A. 4, 1962) (notice of change of address insufficient where sent to a district director in a district other than the one issuing the notice of deficiency), and cases cited. Moreover, section 301.6903–1(b), Proced. & Admin. Regs., promulgated under the express grant of authority in section 6903(b), requires that the section 6903(a) notice be filed with the appropriate *district director.* No other form of notice is sufficient. See *Sanborn* v. *Helvering,* 108 F. 2d 311 (C.A. 8, 1940). Therefore, the notice of deficiency mailed to "Mr. Ernest Clarke, Deceased" is valid as to the estate. See *Edward A. Kenney,* 37 T.C. 1161, 1168–1169 (1962) ; *Edwin W. Eisendrath et al., Executors, supra;* cf. *Rite-Way Products, Inc.,* 12 T.C. 475, 478 (1949).

Granting respondent's motion does not involve adding the estate as a party to these proceedings, as maintained by petitioners. Instead, we think it is evident from the petition and other documents filed by petitioners that the estate has been a party from the beginning, and changing the caption merely reflects the true situation as it has existed. Cf. Rules 6 and 23(d), Tax Court Rules of Practice.

Consistent with modern practice, a pleading must be "properly read and considered as a whole and construed in [its] entirety," *Evans* v. *International Typographical Union,* 81 F. Supp. 675, 680 (S.D. Ind. 1948), and "judged by its substance and not its form," *Kerrigan's Estate* v. *Joseph E. Seagram & Sons,* 199 F. 2d 694, 696 (C.A. 3, 1952). Cf. Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice.") ; *Maty* v. *Grasselli Co.,* 303 U.S. 197, 200–201 (1938). Thus, if there is an inconsistency between the body of a petition and the form of its caption, the former controls. *Bankers Realty Syndicate,* 20 B.T.A. 612, 616 (1930) ; see *Estate of Thomas E. Arnett,* 31 T.C. 320, 330 (1958) ; cf. *Bauers* v. *Watkins,* 7 F.R.D. 150 (N.D. Ohio 1945).

Examination of the petition as a whole—referring throughout to more than one petitioner, and subscribed and verified by "Hilda Clarke, individually, and as surviving spouse of Ernest Clarke, deceased," with verification of counsel stating that "he is the attorney for the

Petitioners and that he proposed the foregoing Petition on behalf of ERNEST CLARKE, Deceased, and HILDA CLARKE, surviving spouse"— leaves no doubt that the petition constituted an appeal to this Court to redetermine not only Hilda's individual liability, but also the deficiencies and additions to the tax determined against her husband's estate.[13] *See Estate of Charles A. Peterson*, 45 T.C. 497 (1966) ; *Bankers Realty Syndicate, supra;* cf. Fed. R. Civ. P. 9(a), 17(a) ; *Suders* v. *Campbell*, 73 F. Supp. 112, 115 (M.D. Pa. 1947). Indeed, we think it is clear that during any stage of the pendency of the present proceedings, the estate could have properly moved to enjoin assessment or collection of the determined deficiencies and additions. Sec. 6213(a).

---

[13] We observe in passing that since the notice of deficiency is valid as to the estate, a contrary conclusion would apparently subject the estate to immediate assessment of the full amount of the deficiencies and additions. Sec. 301.6903–1(c), Proced. & Admin. Regs.