Tully V. Foster v. Commissioner. Tully V. Foster and Mary A. Foster v. Commissioner.
Foster v. Commissioner
Docket Nos. 4009-70 and 4010-70.
United States Tax Court
T.C. Memo 1972-188; 1972 Tax Ct. Memo LEXIS 67; 31 T.C.M. (CCH) 913; T.C.M. (RIA) 72188; August 29, 1972
John Kennedy Lynch, Conway & Lynch, 907 The East Ohio Bldg., Cleveland, Ohio, John J. Kane, Jr., and John E. Phillips, for the petitioners. Larry L. Nameroff, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in income tax and additions to the tax as follows: Docket No. 4009-70
(Tully V. Foster)
Additions to tax
Year
Deficiency
[1] (Sec. 6653(b)) 1955
$4,015.40
$2,007.70
1956
3,147.68
1,573.84
1957
2,169.34
1,084.67
1958
2,604.36
*68 Docket No. 4010-70
(Tully V. Foster and Mary A. Foster)
Additions to tax
Year
Deficiency
(Sec. 6653(b))
1959
$ 31,281.57
$15,640.78
1960
44,363.10
22,181.55
1961
123,926.53
61,963.27
1962
127,582.09
63,791.04 Due to concessions by the parties, the only issues remaining for decision are: (1) How much, if any, cash was obtained by petitioners [2] from nontaxable sources and utilized by them to acquire property during the taxable years in 914 question, with the result that an otherwise unexplained increase in their net worth sould be correspondingly reduced for the purpose of computing their taxable income. *69 (2) The extent to which any such property should be considered as being owned by other persons, with similar consequences with regard to the increases in petitioners' net worth and taxable income. (3) Whether or not any part of the underpayment in petitioners' income tax for each of the years involved was due to fraud with intent to evade taxes. [3]
Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Tully V. Foster and Mary A' Foster (hereinafter sometimes referred to as Tully and Mary, respectively) are husband and wife and had their legal residence in Canton, Ohio, at the time of the filing of the petitions herein. Tully filed individual income tax returns for the taxable years 1955 through 1958 with the district director of internal revenue, Cleveland, Ohio. Petitioners filed joint individual income tax returns for the taxable years 1959 through *70 1962 with the district director of internal revenue, cleveland, Ohio. Tully came to this country from Italy at the age of six in 1920, accompanied by his parents and younger sister Carolyn, also known as Carol or Caroline. The family settled in Youngstown, Ohio, where Tully's father, whose surname was Frastornini, found employment in a steel mill. Tully's parents were divorced in 1927. In 1928, Tully's mother married one Harry Ritchey, a fire bricklayer whose work required him to be away from home much of the time. They were divorced in 1934. Throughout the period from the early 1920's until the repeal of prohibition in 1933, the family's major source of income came from bootlegging activities which were conducted as an all-cash operation in Youngstown and Masury, Ohio. During this period, the family also carried on a restaurant business, which continued after the end of prohibition and until 1947, along with the legal sale of liquor and the operation of slot machines. These bootlegging, restaurant, and related activities were under the supervision of Tully's mother, also known at various times as Mary Cellinese (her maiden name) and Mary Ritchey (hereinafter sometimes referred *71 to as Mother Foster) and she controlled the cash proceeds therefrom. These activities were sufficiently lucrative to enable Tully's mother to accumulate various amounts of cash, most of which was hidden in locations around the family living quarters. Tully worked in the family business from the time he was 14 years of age. He was graduated from high school in 1932 and then spent a year attending music school in Warren, Ohio. During his year of music school, he commuted daily and continued to work at the restaurant during his spare time. In 1934, he entered Ohio State University at Columbus, Ohio, from which he received a degree in business administration (with a major in advertising) four years later. During his years at college, he came home and worked at the restaurant on holidays and during the summer recesses. Tully married petitioner Mary Foster (hereinafter sometimes referred to as Mary or Mary A. Foster) in 1940. They both lived with Mother Foster and worked at the restaurant until about 1944, by which time business had declined significantly. At that time, petitioners decided to go into business for themselves in Canton, Ohio. To this end, Tully's mother acquired an old *72 night club at 5079 W. Tuscarawas Street for about $20,000. Tully became the owner of the club in late 1945 when he paid the $20,000 purchase price plus interest at six percent per annum to his mother. In 1947, Mother Foster finally sold her restaurant business (it had been up for sale since 1944) and moved to Youngstown, Ohio. In about 1949, Mother Foster loaned approximately $25,000 to her daughter (Tully's sister) and son-in-law to enable them to acquire a bar in Youngstown, Ohio. This amount was repaid with interest. In about 1950-1951, Mother Foster had a house built for herself in Youngstown, Ohio. At various times during the years 1932 to 1963, there were 17 savings accounts in 915 institutions in Sharon, Pennsylvania, and Akron, Youngstown, and Cleveland, Ohio, 16 of which were in the name of Mother Foster individually or jointly with her son Harry Ritchey (Tully's half-brother) and one in the name of Mother Foster and/or Tully V. Foster. During those years, deposits of approximately $265,000 and withdrawals of about $214,000 were made. The highest aggregate balance in said accounts during any of the foregoing years was $50,000 on December 31, 1947. The maximum amount *73 on deposit in the account in the joint names of Mother Foster and Tully was approximately $11,650; the bulk of this amount had been withdrawn on February 5, 1952, and the account was closed by a withdrawal of $578.51 on September 17, 1953. Only four of the accounts were in existence at any point of time during the taxable years in question and one of these accounts represents a transfer of another account from the joint names of Mother Foster and Harry Ritchey to Mother Foster individually. In the years 1940 through 1943, 1948, 1961, and 1962, Mother Foster filed no Federal income tax returns. For the other years during the period 1940 through 1964, she filed such returns; the maximum tax shown to be due on any return was $82.58 for 1949. Mother Foster filed no gift tax returns at any time during the period 1940 through 1956. In 1952-1953, petitioners changed the emphasis of their business in Canton, Ohio, from a night club to a general menu restaurant with bar. By 1955, the business was run as a night club on one night per week and a restaurant on the other nights. Petitioners continued operating in this manner, with only moderate success, until 1958 when they began to experiment *74 with a buffet in addition to their general menu. The buffet style caught on and gradually, over a period of years, replaced the general menue format theretofore employed. In order to stimulate business when they started using the buffet format, petitioners sold buffet lunches at a lower price than they charged for the comparable buffet meal at dinner, which remained $2.50 during the years in issue. The luncheon buffet was originally $1.25, then $1.35, $1.50, and finally $1.75 per person, until it was cut out altogether after 1963. Petitioners' restaurant business was a volume operation (they used between 700-900 pounds of fresh shrimp each week), catering primarily to the family, schools, churches, athletic teams, etc. During the early years of operation, the restaurant was open seven days a week and later on (the record is unclear as to the year) it was closed on Mondays. During the years when both lunch and dinner were served, the restaurant was open from about 10.00 a.m. until 10.00 p.m. Petitioners also did a banquet business in rooms available for that purpose. The seating capacity of the restaurant itself was in excess of 500 persons. The operation was run as a cash business *75 throughout the years in issue. On numerous occasions throughout 1960, the "daily sales" figure, indicated on the journal prepared by petitioner Mary A. Foster, did not accurately reflect petitioners' total receipts for the day. Instead, the journal entries often represented receipts from either the noon or evening meals, but not both. Petitioners received income from banquets provided to Ashland Oil & Refining Company on the following dates and in the following amounts: Dates
Amounts
Jan. 28, 1959
$1,427.15
Dec. 1, 1959
1,600.13
Mar. 13, 1961
1,502.90
Feb. 15, 1962
1,417.10 None of these amounts appear in petitioners' journals at or about the dates indicated nor in petitioners' income as reported in their tax returns for the years indicated. During the years involved herein, petitioners reported gross receipts from the operation of their restaurant in the amounts indicated below: Years
Amounts
1955
$ 56,271.80
1956
45,992.01
1957
36,503.29
1958
58,201.32
1959
106,146.66
1960
138,201.85
1961
149,421.71
1962
196,549.88
During the period 1944-1954, Mother Foster gave petitioners not more than $50,000 in cash. Said transfers *76 were unconditional gifts. Most of said funds were expended by petitioners prior to December 31, 1954. Mother Foster made no gifts to petitioners after that date. Mary Markusic, the mother of petitioner Mary A. Foster, was born in Yugoslavia in 1888. She came to this country with her parents at the age of two. At the age of 16 she married Tom Markusic, a steel worker. Over the years, the Markusic family (which included 6 children) derived income from several activities, including Mr. 916 Markusic's employment as a steel worker, the taking in of boarders, the sale of homegrown farm produce, Mrs. Markusic's sewing, and the selling of home-made wine. Tom Markusic died in 1957. In his will admitted to probate he left his entire estate to his wife. His estate consisted of 36 shares of U.S. Steel stock valued at $2,411 and an interest in real estate appraised at $5,000. At no time did either of Mary's parents give petitioners any money either to invest on behalf of the Markusic family or to use for their own purposes. During the period 1954-1962, 100 shares of Timken Roller Bearing Company and 600 shares of Studebaker Company were recorded in the name of Mary A. Foster. The original *77 cost of these assets was $4,150 and $10,417.50, respectively. During 1955, petitioners purchased the following securities in the name of Mary A. Foster: No. of
shares
Company
Broker
Price
100
Ward Baking Co.
Merrill Turben & Co. (Canton, Ohio)
$ 1,671.65
100
Monsanto Chem. Corp.
Merrill Turben
4,135.65
100
Anderson Clayton Co.
Merrill Turben
3,344.21
100
McGraw Edison
McDonald & Co. (Canton, Ohio)
4,789.00
In 1956, petitioners engaged in the following stock trans In 1956, petitioners engaged in the following stock transactions: No. of
shares
Company
Broker
Price
Purchases:
100
Federal Mogul-Bower Bearings
Not avaiable
$ 3,250.00
100
Rheem Mfg. Co.
Merrill Lynch (Akron, Ohio)
3,017.59
100
Allis Chalmers
Bache & Co. (Akron, Ohio)
3,221.44
100
May Company
Not available
3,837.50
Sales:
100
McGraw Edison
Merrill Turben
6,753.85
All of the 1956 transactions were in the name of Mary A. Foster with the exception of the shares of Rheem Manufacturing Company, which were purchased through an account in the name of Mrs. Mary Cellinese, 5079 West Tuscarawas Street Canton, Ohio, the address *78 of petitioners' restaurant. In 1957, petitioners engaged in the following stock transactions in the name of Mary A. Foster: No. of
shares
Company
Broker
Price
Purchases:
100
Fruehauf Trailer Co.
Bache & Co.
$ 2,314.19
Sales:
100
Federal Mogul-Bower Bearings
Bache & Co.
4,209.11
In 1958, petitioners sold 100 shares of May Company stock through Merrill Turben for $4,565.89. In 1959, petitioners engaged in the following stock transactions in the name of Mary A. Foster: No. of
shares
Company
Broker
Price
Purchases:
200
Boeing Co.
Bache & Co.
$ 7,827.01
300
Boeing Co.
Bache & Co
11,313.01
100
Amerada Petroleum Co.
Bache & Co.
7,371.58
Sales:
100
Fruehauf Trailer
Bache & Co.
2,339.24
100
Ward Foods (formerly Ward Baking)
Bache & Co.
1,646.53
100
Monsanto Chem.
Bache & Co.
4,812.88
4
Fruehauf Trailer
Bache & Co.
89.09
6
Monsanto Chem.
Bache & Co.
284.54 917 In 1961, petitioners engaged in the following stock transactions: No. of
shares
Company
Purchases:
Broker
Price
200
General Dynamics
Merrill Lynch
$ 6,495.27
100
American Machine & Foundry
Merrill Lynch
4,541.65
100
American Machine & Foundry
Oppenheimer & Co. (N. Y., N. Y.)
4,441.00
100
Chesapeake & Ohio (C. & O.)
Oppenheimer & Co. (N. Y., N. Y.)
5,551.99
* 500
Royal Dutch Petroleum
Walston & Co. (Ft. Lauderdale, Fla.)
16,011.69
* 100
St. Regis Paper Co.
Merrill Lynch
3,210.03
* 300
General Dynamics
Merrill Lynch
10,534.29
100
American Machine & Foundry
Merrill Lynch
4,328.09
200
American Cyanamid
Francis I. Dupont (kron,Ohio
8,379.50
100
C. & O.
Merrill Turben
5,719.68
100
C. & O.
Merrill Lynch
5,700.00
300
American Cyanamid
Paine, Webber, Jackson & Curtis (Akron, Ohio)
12,607.08
300
C. & O.
Francis I. Dupont
17,100.00
100
Aluminum Corp. of America
Merrill Turben
5,782.24
(Alcoa)
** 100
Westinghouse Corp.
Bache & Co.
3,988.75
**100
Alcoa
Bache & Co
5,782.24
** 100
Bethlehem Steel
Merrill Turben
4,126.94
** 100
Alcoa
Butler Wick
5,794.75
300
C. & O.
Walston & Co. (Pittsburgh, Pa.)
16,878.01
100
C. & O.
Walston & Co.
5,577.66
Sales:
100
St. Regis Paper Co.
Paine, Webber,jackson & Curtis
4,017.46
100
Amerada Petroleum Co.
Butler-Wick (Youngstown, Ohio)
9,044.07
100
Anderson Clayton Co.
Francis I. Dupont
4,154.23
*79 All of the 1961 transactions were in the name of one or both of petitioners except the following: (a) 200 shares of General Dynamics and 100 shares of American Machine & Foundry were purchased through an account in the name of Mrs. Mary M. Markusic, 5091 West Tuscarawas Street, Canton, Ohio; (b) 100 shares of American Machine & Foundry were purchased through an account in the name of Mrs. Carolyn Carter (Tully's sister), 5079 Tuscarawas Street, Canton, Ohio; and 100 shares of C. & O. and 300 shares of American Cyanamied were purchased in the name of Mrs. Mary A. Cellinese, 5079 and 5081 W. Tuscarawas Street, Canton, Ohio. Although Mary Foster frequently used her middle initial A (for Agnes), Mary Cellinese never used the middle initial A on any of her savings accounts or other documents appearing in the record herein. In 1962, petitioners purchased the following stocks in their own names: No. of
shares
Company
Broker
Price
500
C. & O.
Walston & Co
$28,171.99
200
C. & O.
Walston & Co.
11,289.85
300
C. & O.
Walston & Co.
16,834.35
300
C. & O.
Hayden Stone & Co. (Ft. Lauderdale, Fla.)
16,433.31
100
C. & O.
Hayden Stone & Co. (Ft. Lauderdale, Fla.)
5,469.43
100
C. & O.
Hayden Stone & Co. (Ft. Lauderdale, Fla.)
5,557.01
200
C. & O.
Hayden Stone & Co. (Ft. Lauderdale, Fla.)
10,901.31
300
C. & O.
Hayden Stone & Co. (Ft. Lauderdale, Fla.)
16,283.16
*80 All of the purchases of securities by petitioners during the years 1955 through 1962 were made with their own money and said securities belonged to them, irrespective of the fact that some of them were acquired in the names of other persons. Petitioners owned stock on December 31 of each of the following years, which had a cost to them in the following amounts: Year
Amounts
1954
$ 14,567.50
1955
28,508.01
1956
37,045.54
1957
36,109.73
1958
32,272.23
1959
50,662.34
1960
50,662.34
1961
189,287.38
1962
300,227.79 918 During the years in issue, petitioners purchased various parcels of real estate, some of which were income-producing. Title to some of these properties was taken in the names of Mary Markusic, Mary A. Markusic, or Mary Agnes Markusic. All of said real estate was acquired by petitioners with their own funds and was at all times pertinent owned by one or both of the petitioners, the aforesaid names being used as the name of Mary A. Foster in these transactions. In January 1961, petitioners purchased a residence property located at 5465 N.E. 5th Avenue, Ft. Lauderdale, Florida, with their own funds for a price of $14,485.08. The *81 title to this property was placed in the name of Mary Catherine Markusic, the mother of petitioner Mary A. Foster. Subsequently, in consideration of petitioners having provided the funds for the purchase of this property, Mrs. Markusic transferred her farm located at 575 Wilcox, Youngstown, Ohio, to Mary A. Foster. [4]
During the years in issue, dividends were declared and paid to the registered owners of the shares of stock acquired by petitioners, as indicated previously herein, in the following amounts: Year
Amounts
1955
$ 600.00
1956
942.00
1957
12,270.42
1958
1,131.00
1959
1,179.50
1960
1,679.10
1961
3,456.85
1962
14,217.77
The dividend checks issued to the order of Mary Cellinese in 1962 from American Cyanamid and in 1961 and 1962 from C. & O. were endorsed by either Tully or Mary Foster. A dividend check with respect to Rheem Manufacturing and to the order of Mary Cellinese issued on June 12, 1956 by Merrill Lynch, Pierce, Fenner & Beane bore the endorsement of Tully Foster. A check from Merrill Lynch, Pierce, Fenner & Smith dated July 19, 1961, pertaining *82 to an overpaid account in the name of Mary M. Markusic, issued to the order of the aforesaid, bore the endorsement of Tully Foster. The dividends paid in the amounts set forth above, including those paid on the stock registered in the names of Mary Cellinese, Mary Markusic, and Carolyn Carter, were received by petitioners and constituted income to them. Petitioners did not report any dividend income on their income tax returns for 1955 through 1960. On their joint return for 1961, they reported $528 from Timken Roller Bearing and $125 from Allis-Chalmers. On their income tax return for 1962, they reported the same amounts as in 1961. Subsequent to the commencement of the audit by the Internal Revenue Service, petitioners filed their 1963 income tax return, reflecting dividend income in the amount of $16,192. During the period 1954 through 1962, petitioners maintained 16 savings accounts at 10 different institutions located in Fort Lauderdale, Florida, Canton, Ohio, and Cleveland, Ohio. The total balances of said accounts on December 31 for each of the following years were: Years
Amounts
1954
$32,494.77
1955
15,864.93
1956
15,389.41
1957
939.30
1958
971.20
1959
9,832.96
1960
12,235.91
1961
13,800.28
1962
9,707.65
*83 The funds in the aforementioned savings accounts belonged to petitioners and the accounts earned interest in the following amounts: Year
Amount
1955
$556.62
1956
424.48
1957
259.41
1958
31.90
1959
230.23
1960
402.95
1961
708.97
1962
206.21
On their income tax returns for the years 1955 through 1960, petitioners did not report any interest income. Their return for 1961 reflected $244.88 of interest income and for 1962 they reported $206.76. In 1963, they reported interest income of $2,847.02. Petitioners reported no income from the sale of stocks for any of the years involved herein. For 1963, they reported net capital gains of $20,358.75. They had net longterm capital gains in each of the following years in the amounts indicated: 919 Year
Amount
1956
$1,964.85
1957
959.11
1958
690.20
1959
1,050.79
1961
2,482.51 Petitioners also had a short-term capital gain (St. Regis stock) in 1961 in the amount of $807.43. Petitioners had gross receipts from the sale of capital assets as follows: Year
Amount
1956
$ 6,753.85
1957
4,209.11
1958
4,565.89
1959
9,172.28
1960
13,198.30
1961
4,017.46
1962
[5] Unknown *84 Petitioners did not report any rental receipts from real estate (with the exception of small amounts relating to billboard space which were reported as "other income") [6] in any of the years 1955 through 1959. In 1960, petitioners reported rental receipts from the property located at 5055 West Tuscarawas Street, Canton, Ohio. The depreciation schedule in petitioners' 1960 return indicates "Date acquired" as January 1, 1960. Said property was actually acquired on July 8, 1955. In petitioners' income tax return for 1961, rental receipts were included from property located at "217-219 Linwood, N.W." The depreciation schedule lists said property as acquired on December 21, 1960 at a cost of $30,000. Said property was actually acquired on March 11, 1953 at a cost of $27,500. The depreciation schedule *85 on the 1961 return, as well as that on the 1962 return, indicates a cost basis in the would frame house (5055 West Tuscarawas) of $30,000; the cost of said property was $21,000. In their income tax return for 1962, petitioners reported gross rentals from the 5055 West Tuscarawas Street and Linwood properties of $4,439 and net rentals after depreciation of $2,689. In each of the years 1955 through 1962, petitioners' books and records reflected gross receipts from rental properties in the following amounts: Year
Amount
1955
$3,115.00
1956
4,875.00
1957
$ 4,113.00
1958
3,875.00
1959
3,370.47
1960
4,429.56
1961
4,944.88
1962
5,695.00
In 1963, petitioners began reporting income from the property located at 108 Perry Drive Northwest, purchased in September 1961 for $27,500. Petitioners reported taxable income on their Federal income tax returns in the following amounts: Year
Amount
1955
$ 5,643.71
1956
5,145.19
1957
3,155.98
1958
5,216.19
1959
9,433.59
1960
18,432.20
1961
15,645.05
1962
16,585.98
On February 1, 1963, Tully wrote the following letter to Walston & Co., Inc., New York, New York: Gentlemen: *86 This letter certifies that Mrs. Mary A. Foster and Mary Cellinese are one and the same person. Yours very truly, /s/ Tully V. Foster /s/ Mary A. Foster Both signatures thereon were made by Tully. Another letter was written to Walston & Co., Inc., by Mrs. Foster which read as follows: Gentlemen: In reference to my account with you, number 04-03-633-1, this is to advise you that on October 12, 1960, I was married. Therefore, be kind enough to change your records to read: Mrs. Mary A. Foster Street 5079 W. Tuscarawas St. City Canton, Ohio Very truly yours, (signed) Mary A. Foster (formerly) Mary Markusic Revenue Agent John Oliver was assigned to audit petitioners' 1961 income tax return. His first meeting with petitioners took place on November 15, 1963 at petitioners' restaurant. Petitioners told Oliver that they had no source of income in 1961 920 other than what was reflected on the return and that the only money they had came through the business. Petitioners also denied receiving any gifts or inheritances from third parties. Between November 18, 1963 and November 22, 1963, Oliver discovered the existence of stocks and real estate owned by petitioners. *87 Petitioners admitted such ownership and stated that the money to purchase the assets was earned in their business. Oliver met with Tully on December 30, 1963 for the purpose of developing anet worth statement. In response to questions from Oliver, Tully stated that he had between $8,000-$11,000 at the end of 1962, and $7,000-$12,000 at the end of 1961. Tully had no recollection as to cash on hand around 1955 or 1956. On the afternoon of December 30, 1963, Tully called Oliver and told him that his father, Antonio Frastornini, had given him $163,000 in 1944, said amount having been accumulated from bootlegging activities back in the 1920's. Special Agent Nicholas E. Pope, Jr., of the Internal Revenue Service Intelligence Division was assigned to the investigation on April 23, 1964. By that time, petitioners had secured the services of attorneys Samuel Krugliak and Michael Mokadean. On April 28, 1964, Mr. Krugliak told Pope that Tully had received $163,000 in cash from his father. On July 9, 1964, Mr. Krugliak advised the special agent that Mrs. Foster had received $60,000 from her father prior to his death but that the cash previously stated to have come from Tully's father should *88 be disregarded. Instead, Mr. Krugliak advised that Tully believed he brought a suitcase containing between $200,000 and $225,000 with him when he came to Canton, Ohio. In connection with the aforesaid investigation, petitioners executed an affidavit on November 6, 1964, which was prepared by their attorney, Mr. Krugliak, after conferring with Tully. In said affidavit, petitioners indicated that certain stocks and real estate purchased in the names of Cellinese, Markusic, and Carter were purchased with petitioners' own money and were actually owned by them rather than the registered owner. Petitioners also indicated in said affidavit that the total amount of cash on hand which they had on December 31, 1956 would not have exceeded $25,000. On April 7, 1967 petitioners were indicted by a Federal grand jury for the Eastern Division of the Northern District of Ohio. Count VI of said indictment sets forth the following charge against the defendants, the petitioners herein: That on or about the 15th day of April, 1963, in the Northern District of Ohio, Tully V. Foster and Mary A. Foster, * * * did wilfully and knowingly make and subscribe a joint income tax return for the year 1962, *89 which was verified by a written declaration that it was made under the penalties of perjury * * * which said joint income tax return for the year 1962 they did not believe to be true and correct as to every material matter in that the said joint income tax return * * * did specifically omit therefrom income derived from (1) banquet facilities in the amount of $1,417.10, and (2) dividends in the amount of $13,564.77, totaling $14,981.87, whereas, as they then and there well knew and believed, such income should have been included and declared. In violation of Section 7206(1), Internal Revenue Code; 26 U.S.C., Section 7206(1). On February 23, 1968, petitioners entered pleas of guilty with respect to Count VI of the indictment set forth above. On June 6, 1968, the United States District Court entered its judgments pursuant to said guilty pleas, which judgments became final on September 6, 1968. Ultimate Findings of Fact 1. Petitioners' assets are the amounts as determined by respondent, with the exception that, at the end of each year, petitioners had currency on hand as follows: End of year
Amount
1954
$30,000
1955
25,000
1956
25,000
1957
20,000
1958
20,000
1959
16,000
1960
12,000
1961
10,000
1962
10,000
*90 2. At least a part of the underpayment of tax for each of the years involved herein is due to fraud with intent to evade tax. Opinion Initially, we note that, while petitioners attempt to claim that the books and records with respect to the restaurant business fully and accurately reflected their income, it is obvious to us that they did not. We were furnished with only limited evidence in this regard and, in point of 921 fact, the evidence presented indicates that petitioners' assertion is without foundation. Our findings of fact reveal specific omissions of receipts from such books and records as are contained in the record herein. In particular, we are convinced that banquet income was omitted from petitioners' books and income tax returns during the years involved herein. In addition, every explanation (and there were several) offered by petitioners to verify the accuracy of the cash register tapes and sales journal in evidence was unsatisfactory. But beyond this, the most that petitioners could possibly claim is that their books and records were consistent with their tax returns. It has long been an accepted principle that consistency is not to be equated with truthfulness. *91 See Holland v. United States, 348 U.S. 121 132 (1954); Thomas v. Commissioner, 223 F. 2d 83, 86 (C.A. 6, 1955), reversing on other grounds a Memorandum Opinion of this Court. We therefore reject petitioners' contention. We also note that the focus of this case is a narrow one. With one exception, the parties are in agreement with respect to every figure in the net worth statement in respect of assets, liabilities, and the socalled below-the-line adjustments. The one exception relates to how much cash the petitioners should receive credit for in determining the amount of their assets for each of the years in issue and how much of the agreed cost of securities and real estate reflected in respondent's net worth determination represents funds derived from gifts of cash from their parents. Since we believe that our disposition of petitioners' assertions in this regard will largely control the issues herein, we now direct our attention to this aspect of the case. The question to be resolved is purely factual and, in the last analysis, the probative value of the evidence herein turns upon our evaluation of the credibility of the testimony of the witnesses. *92 Petitioners' position is that they acquired in excess of $500,000 in cash gifts from their parents and that these funds found their way into known assets attributed to the petitioners in the approximate amount of the otherwise unexplained increases in net worth during each of the taxable years 1955 through 1962. In support of that claim, they contend that Mother Foster gave them about $500,000, said funds to be invested for the benefit of the Foster family, and that Mary Foster's father gave then $60,000 around 1954 to invest for the Markusic family. In adition, petitioners maintain that Mrs. Foster's mother gave then $12,000 to be invested similarly. We are satisfied that Mother Foster was able to accumulate a significant amount of currency from her bootlegging activities during the prohibition era and her restaurant and slot machine operations. However, we are convinced that accumulated nor gave petitioners any amount approaching $500,000 either to invest for the benefit of the Foster family or for their own benefit. The testimony of some of the witnesses (many of whom had varying degrees of interest in the success of petitioner's case) not only conflicted with the testimony of *93 other such witnesses but also was internally contradictory. We see no need to regurgitate the details of such testimony. In a nutshell, we found most of it unworthy of belief. Much of what we have said with respect to the funds allegedly coming from Mother Foster applies equally to the $72,000 claimed to have come from Mrs. Foster's parents. In respect of this latter claim, we are convinced thot neither Mr. nor Mrs. Markusic accumulated any sizeable amount of currency and that petitioners' claim that they acquired money from them to invest for the Markusic family or for petitioners' own benefit is without foundation. Our findings of fact reveal the numerous gyrations on the part of petitioners in seeking to explain to respondent's agents the source of the cash with which the various assets were acquired. We note particularly that petitioners, during the course of respondent's investigation, executed an affidavit, prepared by their attorney after conferring with Tully, which indicates that the total amount of cash which petitioners had on hand as of December 31, 1956 did not exceed $25,000. The affidavit also contained admissions that certain stocks and real estate purchased in *94 the names of Cellinese, Markusic(h), or Carter were bought with petitioners' own funds and were owned by them rather than the registered owner. As we indicated at trial, we do not believe for a moment Tully's story that neither he nor his wife read the affidavit or that the attorney was not authorized to give the affidavit to one of respondent's agents. By way of summary, then, we think that the record herein contains clear and convincing evidence that the stocks and real estate reflected in the assets attributed 922 to petitioners during the years in issue were acquired by them with their own funds for their own account. As a result, the unreported dividends, capital gains, and retal income, as well as the interest on their savings accounts, would under any and all circumstances be taxable to them. In this connection, we are constrained to observe that, even if we were to believe petitioners' story that such assets were acquired with cash received as gifts from their parents, we would be satisfied beyond peradventure that the acquired assets, and the income therefrom, belonger to petitioners, so that the petitioners would have omitted from their tax returns income which was *95 clearly required to be reported. We now turn to the issue of petitioners' liability for additions to tax due to fraud under section 6653(b). The parties are in agreement that, unless fraud is found to exist, the deficiencies herein are barred by the statute of limitations. Respondent, of course, has the burden of proof (see section 7454(a)) and he must establish fraud by clear and convincing evidence. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), reversing on other grounds a Memorandum Opinion of this Court; Estate of Ernest Clarke, 54 T.C. 1149, 1161-1162 (1970); W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 58-1 USTC, 252 F. 2d 681 (C.A. 6, 1958). But it is enough if he presents such evidence with regard to any part of the asserted underpayment of tax. Luerana Pigman, 31 T.C. 356, 370 (1958). Without giving effect in any way to the respondent's net worth determinations, we think that he has unquestionably satisfied his burden of proof. As we have previously held and, as our findings of fact show, petitioners acquired substantial amounts of income-producing assets prior to and during the taxable years *96 in issue. The record is crystal clear that petitioners failed to report substantial (in relation to their total income) amounts of dividends during each of the years in issue and interest during each of the years 1955 through 1961. It is also clear that gains from the sale of stock were omitted in 1956, 1957, 1958, 1959, and 1961. In addition, petitioners failed to report substantial amounts of income in connection with banquets held at petitioners' restaurant by Ashland Oil & Refining Company during 1959, 1961, and 1962. We are also satisfied that petitioners did not report all of the income generated by their restaurant business during the years in issue. Mrs. Foster's explanation as to why dividends and interest were not reported was incredible. We simply do not believe her statement that she and Tully (who had a degree in business administration) thought the corporation took care of the tax on dividends and that she did not know there was any tax to pay on interest. We also do not believe her testimony that she thought there was no need to report rental income until the cost of the property (including mortgages) was paid off. The badges of fraud are unmistakable: Inadequate *97 and incomplete books and records; repeated understatements of income - and in relatively substantial amounts; the use of different names in connection with the acquisition of assets; the use of an unusually large number of brokerage houses and savings institutions at various locations; conflicting and evasive statements during the course of respondent's investigation. We see no purpose in belaboring the point. All in all, on the basis of the record as a whole and our evaluation of the credibility of the witnesses, there is clear and convincing evidence that petitioners in fact received substantial amounts of unreported income and deliberately failed to report the same in each of the years at issue. Our conclusion that there was fraud in respect of those years follows inevitably. Cf. Friedman v. Commissioner, 421 F. 2d 658 (C.A. 6, 1970), affirming per curiam a Memorandum Opinion of this Court; Foster v. Commissioner, 391 F. 2d 727, 733 (C.A. 4, 1968), affirming on this issue a Memorandum Opinion of this Court; Shahadi v. Commissioner, 266 F. 2d 495 (C.A. 3, 1959), affg., 29 T.C. 1157 (1958); Schwarzkopf v. Commissioner, 246 F. 2d 731 *98 (C.A. 3, 1957), affirming on this issue a Memorandum Opinion of this Court; Drieborg v. Commissioner, supra; W.A. Shaw, supra, 27 T.C. at 573; Morris Lipsitz, 21 T.C. 917 (1954), affd., 220 F. 2d 871 (C.A. 4, 1955). There remains the question of the underlying deficiencies. With respect to this aspect of the case and in contrast to the 923 situation in respect of the existence of fraud, the burden of proof is on the petitioners with respect to the deficiencies asserted by respondent even though the foundation of such deficiencies is a net worth computation. See e.g., Cefalu v. Commissioner, 276 F. 2d 122, 125-126 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court; Lawrence Sunbrock, 48 T.C. 55, 63 (1967); compare Foster v. Commissioner, supra, 391 F. 2d at 735. We see no reason to depart from this rule herein simply because there are some indications that the annual increases in net worth, on the basis of which the deficiencies (with the so-called below-the-line adjustments) have been calculated, may not correspond to the amounts of income which could have been realized in each *99 such year from the restaurant business. To some degree, such discrepancies are inevitable in light of the fact that a net worth computation reflects the years in which assets were acquired or money was expended, i. e., when the apparently unreported income surfaced, and not when it was in fact realized. See Polizzi v. Commissioner, 265 F. 2d 498, 501 (C.A. 6, 1959), reversing on other grounds a Memorandum Opinion of this Court. Moreover, the notice of deficiency is not a determination that the unexplained increases in net worth came from petitioners' restaurant business. It is merely a determination that petitioners had unreported income as to which such increases were a measure, with an ancillary pointing of a finger at the restaurant business as a likely source. The failure of respondent to find the exact source of all the increases in petitioners' net worth proves nothing more than that they were well hidden. See Thomas v. Commissioner, supra, 223 F. 2d at 86. Moreover, unreported dividends, interest, and rental income, together with cash derived from the sale of capital assets, created the potential for some increases in petitioners' assets during the *100 years at issue. Additionally, petitioners have chosen to rely solely on the cash gifts explanation and have pointed to the potential income-generating capacity of the restaurant only as corroborative of that explanation. They have neither asserted nor proved that the limits of such capacity make respondent's determinations arbitrary and excessive. Cf. Helvering v. Taylor, 293 U.S. 507 (1935). Similarly, they have not sought to assert that any portion of the otherwise unexplained increases in net worth was generated by income from the restaurant in prior years. [7] Additionally, and perhaps most significant, every figure in the net worth statement, including the so-called below-the-line adjustments, was fully agreed to by the parties. Thus, many of the vagaries which inhere in a net worth computation (see Holland v. United States, supra, 348 U.S. at 127-129) are absent from this case. Under these circumstances, at the very least, it was incumbent upon petitioners to come forward with some other explanation for the net worth increases in the event that they failed to convince the Court with respect to the cash gifts explanation. planation. Cf. Gatling v. Commissioner, 286 F. 2d 139, 145 *101 (C.A. 4, 1961), affirming a Memorandum Opinion of this Court; Shahadi v. Commissioner, supra; Thomas B. Jones, 29 T.C. 601, 614 (1957). We are of the opinion, however, that respondent erred in failing to give petitioners credit for some cash. As our findings of fact indicate, we are satisfied that petitioners did receive some cash gifts from Mother Foster prior to 1954 and that not all of the cash was expended by December 31 of that year. We are also satisfied that, as of December 31 of each year in issue, petitioners customarily had some cash on hand from their restaurant business. In making our determination as to the amount of cash for which petitioners should receive credit, we have done the best we could with the record before us and have set forth in our ultimate findings of fact the amount of cash which petitioners had on hand as of January 1, 1955 and when that *102 cash was expended. Estate of Mercure v. Commissioner, 448 F. 2d 922 (C.A. 6, 1971), affirming a Memorandum Opinion of this Court [Dec. 30,195(M)]; Michael Potson, 22 T.C. 912, 929 (1954), affd. sub. nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956). To this extent, respondent's net worth determinations must be modified, with a consequent redetermination of the amount of the deficiencies and additions to tax for which petitioners are liable. Decisions will be entered under Rule 50. 924 Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The term petitioners will be used herein to refer to either Tully V. Foster or Tully V. Foster and Mary A. Foster, depending upon the context and the year under discussion. With respect to the taxable years 1955 through 1958, the term is used to refer to Tully V. Foster. In this connection, we note that petitioners have made no claim that any income or increase in net worth determined by respondent for those taxable years should be modified to reflect ownership by@mary A. Foster rather than Tully V. Foster.↩
3. Respondent has conceded that the statute of limitations is a bar to the assessment and collection of the deficiencies asserted herein for any year in which the Court finds no fraud. See section 6501(c) (2).↩
*. These purchases were all made on July 27, 1961. ↩
**. These purchases were all made on November 6, 1961.↩
4. Only the Youngstown property is included in respondent's net worth determination.↩
5. Petitioners' 1962 income tax return does not reveal any sales of capital assets, and the record is otherwise silent on this score except to the extent that no below-the-line adjustment for long-term capital gains was made in respondent's net worth determination for that year.↩
6. In some years, petitioners reported an additional $600 as income from the use of an apartment.↩
7. If any such year had been prior to 1955, it would not have been before us. If any such year were an earlier year before us, such an assertion would have produced an increased deficiency which was not claimed by the respondent and as to which he would have had the burden of proof.↩